No. 95,682

STATE OF KANSAS, *Appellee*, v. JASON D. OVERSTREET, *Appellant*.

(200 P.3d 427)

Opinion filed January 30, 2009.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Paul J. Morrison*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Following a jury trial, Jason Overstreet was convicted of aggravated assault and attempted first-degree murder. Before the Court of Appeals, he claimed the following trial errors required reversal of his convictions: (1) instructional errors on aiding and abetting, (2) prosecutorial misconduct, (3) the granting of additional summation after jury deliberation had begun, (4) the giving of an additional instruction to resolve jury indecision after deliberation had begun, (5) ineffective assistance of counsel, and (6) improper conviction of two charges that were charged in the alternative. The Court of Appeals affirmed in an unpublished opinion. *State v. Overstreet*, No. 95,682, unpublished opinion filed February 8, 2008. We granted Overstreet's petition for review and now reverse and remand for a new trial.

FACTS

Late in the evening on December 7, 2004, Damian McCall was in the drive-thru of a fast-food restaurant in Wichita when he noticed a green Chevy Tahoe pull up behind him. According to McCall, the driver of the Tahoe leaned out the window and looked at McCall's customized Ford Expedition. McCall thought the

driver looked like a rapper named Chingy and mentioned this fact to his friend with whom he was talking on his cell phone.

McCall picked up his food and started to drive home. The Tahoe pulled out immediately behind McCall without stopping to pick up any food at the drive-thru window. McCall eventually got on to the highway and drove several miles until he took the Pawnee exit. The Tahoe remained behind McCall during this entire drive.

Shortly thereafter, McCall approached his apartment complex and backed into a parking spot so he could watch the Tahoe. The Tahoe turned into the parking lot and drove past McCall's Expedition; it then turned around and drove by McCall a second time. When the Tahoe reached the parking lot exit, it again turned around, blocking a truck that was nearby.

After turning around this second time, the Tahoe drove back toward McCall's vehicle and stopped. McCall saw a man jump out of the passenger side and run toward his Expedition. When he observed the man "reach and pull something" from his person, McCall lay flat in his vehicle in case it was a gun. The man fired several shots into the front of the Expedition. McCall was not hurt.

Once the shooting ceased, McCall sat up and saw the man running away. McCall put his Expedition in drive and rammed the Tahoe. McCall's vehicle flipped as a result of the collision, and the occupants of the Tahoe fled on foot.

When the police arrived at the scene, they found eight cartridge casings and two bullet fragments in the apartment complex parking lot. McCall's expedition had been struck by bullets six times: five bullets hit the front of the SUV on the driver's side, and one bullet struck the windshield on the passenger's side.

The police also found three cell phones inside the Tahoe and one on the grass outside the driver's door. One of the cell phones found inside the Tahoe on the front passenger-side floorboard belonged to Tracy Lafferty. Lafferty had loaned the cell phone to Jason Overstreet (the defendant in this case) the previous month, and it had never been returned.

Shortly after the incident, three men were apprehended at the nearby Wal-Mart: Kendrick Shears, James Walker, and Ishmel Agnew. Joshua Bauder and Tyler Mott—who had both been in the

truck near the parking lot exit and had witnessed the shooting—identified Shears as the shooter and Walker as the driver of the Tahoe.

Police obtained fingerprints from three areas on the Tahoe. One print was found on the exterior of the driver's door, and two prints were found outside the passenger door. Tests matched the passenger-side prints to Shears, but none of the prints matched Agnew or Walker.

Further investigation ensued. During Detective Randall Reynold's interview of Ishmel Agnew, Agnew mentioned the name "Jason" in connection with his description of the events but did not provide a last name. Reynolds also interviewed Linda Dubois, who owned the Tahoe. Dubois informed Reynolds that she loaned the Tahoe to a man named "Jason" at her friend Jeff's house.

Reynolds later spoke with Jeffrey Fay, Dubois' friend, who indicated that the "Jason" discussed was Jason Overstreet. Fay testified at trial that he remembered Dubois lending Overstreet the Tahoe. According to Fay, Overstreet left in the Tahoe and returned with three or four black men, then left a second time.

Reynolds subsequently showed McCall a photo array that included Overstreet's picture and pictures of five other similar individuals, asking McCall whether any of these men were the driver of the Tahoe that had followed him home from the restaurant. McCall circled Overstreet's picture and wrote that Overstreet "resemble[d] the driver" but that McCall was "not one hundred percent sure."

Fingerprint analysis also matched Overstreet's prints with the fingerprint found on the Tahoe's driver's side door.

The State charged Overstreet with attempted first-degree (premeditated) murder or—in the alternative—aggravated assault, both based on an aiding and abetting theory.

At trial, McCall again identified Overstreet as the driver of the Tahoe, testifying that although he could not be 100 percent certain because it was dark on the night of the incident, he was "about 85, 90 percent sure." McCall based his identification of Overstreet on the fact that he had seen the driver lean out of the window in the drive-thru and on his observation of the Tahoe as it followed him

in the parking lot of his apartment complex, which had some light-
ing outside the apartment building.

Because Overstreet was not found on the night of the shooting,
no witnesses were able to identify him at the crime scene except
the victim, based on observations earlier in the evening.

The State did not call Bauder or Mott as witnesses. Overstreet's
defense counsel attempted to introduce Bauder's and Mott's iden-
tifications of Walker—not Overstreet—as the Tahoe's driver dur-
ing the cross-examination of Detective Reynolds, but these iden-
tifications were excluded on the basis of hearsay. Overstreet's
counsel subsequently moved the district court for a continuance,
indicating that he intended to call Bauder and Mott as witnesses
for the defense but had thus far been unable to locate them. The
district court granted a continuance of the trial until the next morn-
ing to give defense counsel an opportunity to find the men.

Bauder testified for the defense the following morning. He ex-
plained that he "believe[d]" he identified Overstreet at the scene,
but he was uncertain of that identification because he was focused
primarily on the shooter, not the driver. After Bauder testified,
defense counsel recalled Detective Reynolds, who testified that
Bauder identified Walker—not Overstreet—as the driver on the
night of the incident and that Overstreet had not been present at
the time.

During deliberations, the jury submitted several questions for
clarification to the district court and also requested the readback
of trial testimony. On the morning of the second day of delibera-
tions, the court asked the jury if it would benefit from additional
summation from counsel. The jury requested summation on two
points: (1) the intent of the shooter and (2) whether Overstreet
had to be driving the Tahoe in order to be found guilty of the
charges on an aiding and abetting theory. While defense counsel
objected to the ground rules for the additional summation, there
was no objection by either party to the additional summation, and
both counsel agreed to provide additional argument on the re-
quested topics.

Later on their second day of deliberation, the jury notified the
court that it had reached a unanimous decision on the aggravated

assault charge but was split on the attempted murder charge. With the consent of the parties, the court instructed the jury to continue with deliberations in an effort to reach a verdict. Shortly thereafter, the jury returned guilty verdicts on each of the alternative charges.

Before sentencing, Overstreet filed a pro se motion for a new trial that included several claims of ineffective assistance of counsel, among them an allegation that his defense counsel did not adequately prepare for trial since he did not locate Mott and did not adequately prepare Bauder as a witness, given Bauder's confusion as to his identification of the defendant at the crime scene.

Defense counsel also filed a motion for judgment of acquittal or for a new trial based, among other reasons, on the court's allowance of additional summation and the jury instruction provided on aiding and abetting.

The court denied both motions. The defendant was sentenced to 195 months in prison for the attempted first-degree murder conviction; the court did not impose a sentence on his aggravated assault conviction since the crimes were charged in the alternative, although this conviction was noted on the journal entry.

Overstreet's appeal was stayed, and the Court of Appeals remanded his case to the district court for a hearing on his ineffective assistance of counsel claims. After an evidentiary hearing, the district court concluded that he was adequately represented at trial. His convictions and sentence were affirmed, and we granted the defendant's petition for review.

(1) AIDING AND ABETTING INSTRUCTION

Overstreet argues that the district court's aiding and abetting instructions misstated the law in that the jury was advised it need not find beyond a reasonable doubt that Overstreet had premeditated the attempted murder. Overstreet also argues that the prosecutor committed reversible misconduct in his discussion of the aiding and abetting instruction during closing argument by claiming that the State need only prove that he was guilty of aggravated assault to show that he was also guilty of premeditated murder. The State claims—and the Court of Appeals agreed—that both the

instructions given and the prosecutor's discussion of those instructions were proper.

*Discussion*

The State charged Overstreet with aggravated assault and attempted first-degree murder, both based on an aiding and abetting theory. At the close of evidence, the district court provided the following instruction to the jury on aiding and abetting:

"A person who, either before or during its commission, intentionally aids, abets or procures another to commit a crime with the intent to promote or assist in its commission, is criminally responsible for the crime committed regardless of the extent of the person's participation, if any, in the actual commission of the crime.

"A person who intentionally aids another to commit a crime is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the other crime was reasonably foreseeable."

As the prosecutor was discussing the jury instructions during his closing argument, he provided the following explanation of the aiding and abetting instruction:

"Now, Instruction Number 7, we told you—I told you that this is an aiding and abetting case, and Instruction Number 7 is the instruction that deals with aiding and abetting. I won't go over the whole thing, but I do [want to] emphasize a couple points.

"First, we have to show that Mr. Overstreet intentionally aided the shooter. We have to show that he actually did assist the shooter and that it was with the intent to promote or to assist a crime. So, you know, he can't be doing this accidentally or unintentionally. And, if those three things are present, then the law says, Instruction Number 7 says that he's responsible for the crime, just like if he did it. It says he's responsible regardless of the extent of his participation.

"And he's also responsible, not only for the crime that was intended to be committed but also for any other crime that's reasonably foreseeable. You've all heard the saying, In for a penny, in for a pound, and that's basically the concept here. You're in a little bit, you're in the whole way."

The prosecutor later explained his "in for a penny, in for a pound" comparison in more detail, stating:

"Now, one choice you have is aggravated assault. And the defendant is guilty of aggravated assault. A deadly weapon was used. Mr. McCall feared getting shot, obviously, common sense. He ducked down.

"He's also—the defendant is also guilty of aiding and abetting first-degree murder. He's guilty, even if this defendant only wanted to aid an aggravated assault. If someone in the jury room says, Well, yeah, he was the driver and he probably

wanted to do an aggravated assault, doesn't matter, he's still guilty of attempted first-degree murder. And that's a very important point.

"Because attempted murder, I'd submit to you, is reasonably foreseeable when you go to commit an aggravated assault. And this goes back to our concept in for a penny, in for a pound."

At the end of the prosecutor's first portion of closing argument (before defense counsel gave his argument), the prosecutor concluded:

"[I]f he was the driver of this car, he is an aider and abettor, not only to aggravated assault but also to attempted first-degree murder. He hooked himself to the Kendrick Shears train, and he's gotta go where that train leads. That train committed attempted first-degree murder. I ask that you find the defendant guilty of that offense."

Overstreet claims that the combination of the language of the aiding and abetting instruction and the prosecutor's arguments regarding that instruction relieved the State of its burden of proving premeditation—an essential element of attempted premeditated murder—beyond a reasonable doubt. Overstreet bases his argument on this court's decision in *State v. Engelhardt*, 280 Kan. 113, 119 P.3d 1148 (2005), where we held that the giving of both PIK Crim. 3d 54.05 and PIK Crim. 3d 54.06 (the two instructions given here) in the context of a premeditated first-degree murder case was error. The Court of Appeals in this case held that *Engelhardt* did not control and found no error with either the instructions given or the prosecutor's comments. See *Overstreet*, slip op. at 7-8, 15-16.

*Instructional Error*

We first address Overstreet's claim that the aiding and abetting instruction itself is reversible error because it relieved the State of its burden of proving an essential element of the crime charged. Overstreet did not object to the aiding and abetting instruction provided by the district court. Under K.S.A. 22-3414(3), no party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects, distinctly stating the matter objected to and the grounds for the objection before the jury retires, unless the instruction is clearly

erroneous. Instructions are clearly erroneous "only if the reviewing court is firmly convinced there is a real possibility that the jury would have rendered a different verdict if the error had not occurred. [Citation omitted.]" *State v. Bell*, 280 Kan. 358, 365, 121 P.3d 972 (2005). Reviewing courts must consider the jury instructions as a whole and not isolate any one instruction in reaching a conclusion about the instruction's propriety. See *State v. Mays*, 277 Kan. 359, 378-79, 85 P.3d 1208 (2004).

Initially, we note that the two paragraphs of the aiding and abetting instruction provided by the district court track the language in PIK Crim. 3d 54.05 (Responsibility for Crimes of Another) (first paragraph) and PIK Crim. 3d 54.06 (Responsibility for Crimes of Another—Crimes Not Intended) (second paragraph). The language in the instruction given is also almost identical to the statutory description for aiding and abetting contained in K.S.A. 21-3205:

"(1) A person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime.

"(2) A person liable under subsection (1) hereof is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by such person as a probable consequence of committing or attempting to commit the crime intended."

This court has approved each of these instructions individually as correct statements of K.S.A. 21-3205. See *State v. Gleason*, 277 Kan. 624, 636-38, 88 P.3d 218 (2004) (approving PIK Crim. 3d 54.06); *State v. Manard*, 267 Kan. 20, 34, 978 P.2d 253 (1999) (approving PIK Crim. 3d 54.05). In *Engelhardt*, however, we held that it was error to provide *both* of these instructions when the underlying crime required a specific showing of intent. See 280 Kan. at 131-34.

The defendant in *Engelhardt* was convicted of aiding and abetting premeditated first-degree murder. Just as in this case, the district court provided both instructions on aiding and abetting: PIK Crim. 3d 54.05 and PIK Crim. 3d 54.06. The defendant argued that by providing PIK Crim. 3d 54.06 (the foreseeability instruction), the district court impermissibly lowered the State's burden

of proof on the element of intent since the instruction stated that the prosecution only had to show that the murder was a foreseeable consequence of another criminal act—not that it was premeditated. 280 Kan. at 132-33. We agreed that the instruction negated the intent element of premeditated murder:

"The specific intent required to be proved for conviction on a premeditated first-degree murder charge is premeditation. Therefore, under K.S.A. 21-3205(1), a person guilty of aiding and abetting a premeditated first-degree murder must be found, beyond a reasonable doubt, to have had the requisite premeditation to murder the victim." 280 Kan. at 132.

Nevertheless, this court ultimately held in *Engelhardt* that although it was error for the district court to give the foreseeability instruction contained in PIK Crim. 3d 54.06, the error was harmless in light of the overwhelming evidence against the defendant. See 280 Kan. at 133-34.

Our decision in *Engelhardt* controls our resolution in this case. As in *Engelhardt*, Overstreet was charged in this case with a specific-intent crime under an aiding and abetting theory. Therefore, the State was required to prove beyond a reasonable doubt that he "intend[ed] to promote or assist" in the commission of an attempted first-degree premeditated murder. *Engelhardt*, 280 Kan. at 131; see K.S.A. 21-3205(1). *Engelhardt* makes it clear that to be successful on this theory, the State was required to prove that the defendant shared in the specific intent of premeditation and thus promoted or assisted in the commission of the specific crime of premeditated first-degree murder.

Despite this premeditation requirement, the district court instructed the jury in this case that "[a] person who intentionally aids another to commit a crime is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the other crime was reasonably foreseeable." This foreseeability instruction indicated that the jury need not find that Overstreet possessed the specific intent of premeditation if it found that premeditated murder was a reasonably foreseeable consequence of aggravated assault. In other words, giving the aiding and abetting foreseeability instruction negated the State's burden to prove an essential element of the crime charged: premeditation.

This diminished burden is precisely the type of error disapproved in *Engelhardt*. See 280 Kan. at 132. The district court erred when it provided the foreseeability instruction in this case.

In addition, the foreseeability instruction is inappropriate in a premeditated murder case on the basis of logic. Premeditation does not require that a murder (or attempted murder) be reasonably foreseeable; the only relevant question is whether the defendant thought about the murder before engaging in the intentional homicidal act. See *State v. Hoge*, 276 Kan. 801, 814-15, 80 P.3d 52 (2003). Conversely, the mere fact that an act is foreseeable does not mean that the defendant has premeditated his or her actions. See *Engelhardt*, 280 Kan. at 133. In short, the fact that it may be foreseeable that someone may die as a result of a particular course of action does not give rise to the conclusion that the cause of death was premeditated.

The Court of Appeals erroneously concluded that the State did not need to prove beyond a reasonable doubt that Overstreet premeditated McCall's attempted murder, but needed only show that he attempted to assist the shooter in the original assault. *Overstreet*, slip op. at 7-9.

In reaching its conclusion, the Court of Appeals relied on a portion of this court's opinion in *State v. DePriest*, 258 Kan. 596, 907 P.2d 868 (1995), where we explained that "to find the defendant guilty of aiding and abetting first-degree murder, the jury was required to find that a first-degree murder had been committed and that the defendant aided and abetted that murder with the intent to assist in its completion." 258 Kan. at 603; see *Overstreet*, slip op. at 8. Contrary to the Court of Appeals' application, *DePriest* does not stand for the proposition that "the requisite intent for aiding and abetting liability in a first-degree murder case is the intent to aid and abet the murder with the 'intent to assist its completion,'" rather than premeditation. *Overstreet*, slip op. at 8 (quoting *DePriest*, 258 Kan. at 603). *DePriest* explained that in order to convict a defendant of premeditated murder on an aiding and abetting theory, the jury is required to find (1) "that a first-degree murder had been committed" and (2) "that the defendant aided and abetted *that murder*." (Emphasis added.) 258 Kan. at

603. In other words, the jury must find that the defendant intentionally aided and abetted a premeditated first-degree murder. This showing necessarily requires a finding of premeditation on the part of the aider/abettor. See *Engelhardt*, 280 Kan. at 132-33.

*DePriest* and *Engelhardt* are consistent with the numerous other cases decided by this court holding that for a defendant to be convicted of a specific-intent crime on an aiding and abetting theory, that defendant must have the same specific intent to commit the crime as the principal. See *State v. Schriner*, 215 Kan. 86, 92, 523 P.2d 703 (1974) (quoting *State v. Edwards*, 209 Kan. 681, 498 P.2d 48 [1972]) (stating that K.S.A. 21-3205 " 'makes no change in the degree of proof of intent necessary to establish criminal responsibility' ").

Overstreet failed to object to these instructions, and in accord with our standard of review, we must determine whether there is a real possibility that the jury would have rendered a different verdict if the foreseeability instruction had not been given. K.S.A. 22-3414(3); see *Bell*, 280 Kan. at 365 (citing *State v. Davis*, 275 Kan. 107, 115, 61 P.3d 701 [2003]).

The Court of Appeals concluded that even if any error may have arisen from the aiding and abetting instructions, the error was harmless in light of the other instructions given—in particular, the instruction on attempted premeditated first-degree murder, which stated:

"The defendant, Jason Overstreet, is charged in count one with the crime of attempt to commit the crime of first degree murder. Mr. Overstreet pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. That Mr. Overstreet aided or abetted someone who performed an act toward the commission of the crime of first degree murder;

2. That he did so with the intent to aid or abet someone to commit the crime of first degree murder;

3. That he failed to complete the commission of the crime of first degree murder; and

4. That this act occurred on or about the 7th day of December, 2004, in Sedgwick County, Kansas.

"The elements of first degree murder would be:

1. That someone intentionally killed a human being;

2. That such killing was done with premeditation; and

3. That this act occurred on or about the 7th day of December, 2004, in Sedgwick County, Kansas.

"Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life."

Standing alone, this instruction indicates that to render a verdict of guilty on the attempted premeditated first-degree murder charge, the jury was required to find that the defendant acted with premeditation. Yet this instruction does not overcome the confusion that was injected into this trial by the district court's instruction on foreseeability and the prosecutor's subsequent argument. The instructions as a whole indicate two conflicting legal theories: (1) The jury may convict Overstreet of the attempted premeditated murder if it concludes that he participated in the aggravated assault and that the crime of attempted murder was foreseeable; (2) the jury may convict Overstreet of attempted first-degree murder only if it were to conclude that the crime was premeditated.

Furthermore, the confusion between these conflicting instructions was exacerbated by the prosecutor's comments during closing argument. The prosecutor argued that "the defendant is . . . guilty of aiding and abetting first-degree murder . . . *even if this defendant only wanted to aid an aggravated assault."* (Emphasis added.) The prosecutor additionally stated that "attempted murder . . . is reasonably foreseeable when you go to commit an aggravated assault." Similarly, the prosecutor explained that because Overstreet "hooked himself to the Kendrick Shears [the shooter] train" by aiding or abetting the aggravated assault, "he's gotta go where that train leads"—implying that it was only Shears' premeditation that mattered. According to the prosecutor, the fact that the jury did not have to find that Overstreet himself had premeditated the crime was "a very important point."

In light of our decision in *Engelhardt*, we conclude that giving the aiding and abetting instruction in this case—which included language from both K.S.A. 21-3205(1) and (2)—was clearly erroneous. There is a real possibility that the jury, following this instruction and the prosecutor's subsequent comments during clos-

ing argument, convicted Overstreet of the attempted premeditated murder not because the defendant aided or abetted in the attempted premeditated murder but because the murder was a reasonably foreseeable consequence of the aggravated assault. We therefore reverse and remand for a new trial.

*Prosecutorial Misconduct During Closing Argument*

Overstreet argues that the prosecutor's comments during closing argument amounted to prosecutorial misconduct. We note, however, that the comments of the prosecutor tracked the trial court's instructions on aiding and abetting. While we have held that those instructions were erroneous, we do not fault the prosecution for following the trial court's instructions. We also note that the argument in this case occurred approximately 1 month before we filed our decision in *Engelhardt.* See 280 Kan. at 131-34. We cannot say that the prosecutor engaged in prosecutorial misconduct in this case.

(2) THE COURT'S CONDUCT DURING JURY DELIBERATIONS

Overstreet claims that the district court erred by allowing additional summation to the jury on the morning of the second day of deliberations. He also claims that a supplemental instruction provided to the jury midway through that second day had the improper effect of forcing the jury to reach a verdict on the attempted first-degree murder charge.

This case involved an inordinate amount of contact between the court and the jury after the case had been submitted for deliberation. The jury began deliberations at 10:35 a.m. on August 3. Between that time and the announcement of the jury's verdict, the following events took place:

- On August 3 at 11:15 a.m., the jury requested a readback of McCall's testimony identifying Overstreet as the driver of the Tahoe while McCall was waiting in line at the drive-thru. The jury also requested McCall's police statement and a photograph of James Walker. The court discussed these questions with the attorneys. Neither the police statement nor the photograph had been admitted into evidence, so the court in-

formed the jury they could not request those materials and had to make its decision based on the evidence admitted. The court then requested that the court reporter read back the requested portion of McCall's testimony.

- On August 3 at 1:50 p.m., the jury asked for a readback of Bauder's testimony regarding whether he saw Overstreet at the scene of the crime. The jury also requested a readback of McCall's testimony of "who he saw driving at the apartment complex (scene), if it was mentioned." With the consent of both counsel, the court read back the requested portion of Bauder's testimony and informed the jury that McCall had not testified that he had seen Overstreet at the apartment complex or scene of the shooting.

- On August 3 at 4:35 p.m., the jury asked for an additional reading of Bauder's testimony regarding the identification of Overstreet "to clarify . . . whether or not Jason Overstreet was seen at the scene or [police] substation" the night of the crime. Both parties agreed to have the testimony read back a second time.

- On the morning of the second day of deliberations (August 4), the court suggested that an assistant should ask the jury if additional summation would be helpful to its deliberations. The court explained that "[c]ounsel were in agreement that they [the jurors ought to] be specific about what they wanted." The jury requested additional summation on the "intent of the shooter" and "whether or not the defendant has to be driving to be found guilty of the charges." Defense counsel objected to closing arguments on the second issue since those arguments had not been presented earlier. Defense counsel also objected to the court allowing the prosecutor to split his time. The court overruled both objections, and the parties argued both issues to the jury.

- On August 4 at 12:55 p.m., the jury sent a communication to the court indicating it had "reached a unanimous decision on count two [aggravated assault] and [were] split on count one

[attempted premeditated first-degree murder]." With the consent of both counsel, the court provided the jury with a supplemental instruction encouraging further deliberation.

- On August 4 at 2:50 p.m., the jury returned a verdict of guilty on both charges.

### Additional Summation

Overstreet first argues that the court engaged in impermissible ex parte communications with the jury when he had his assistant ask the jurors whether additional summation from counsel would help clarify some of their questions. No objection was lodged by the defendant to the grant by the trial court to each party of additional summation. Rather, the defendant assented to the court's suggestion that additional argument be provided. Overstreet's defense counsel did object to (1) the second point requested (whether the defendant had to be the driver) because it was not argued before and (2) splitting the State's argument. The defendant does not renew these specific arguments on appeal, nor does he provide any reason why the grant of additional summation in this case prejudiced his fundamental rights. See *State v. Hawkins*, 285 Kan. 842, 845, 176 P.3d 174 (2008). In the absence of an objection to the grant of additional summation, we find that this issue has not been preserved for review. See *State v. Shopteese*, 283 Kan. 331, 339, 153 P.3d 1208 (2007).

### Supplemental Instruction

Shortly after noon on the second day of deliberations, the jurors indicated to the court that they had reached a unanimous decision on the aggravated assault charge but were split on the attempted murder charge. With the consent of both parties, the court provided a supplemental instruction suggesting that the jury identify points of similarity and difference so that it might reach a conclusion if possible. About an hour after the court gave the supplemental instruction, the jury returned a verdict of guilty on both charges. Overstreet characterizes the supplemental instruction as an *Allen*-type instruction and claims that it had the impermissible

effect of forcing the jury to reach a verdict. See *Allen v. United States*, 164 U.S. 492, 41 L. Ed 528, 17 S. Ct. 154 (1896).

Overstreet did not object to the supplemental instruction—either in timing or in substance. Thus, we review that instruction for clear error. K.S.A. 22-3414(3). An instruction is clearly erroneous—and thus a basis for reversal—"only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." *State v. Struzik*, 269 Kan. 95, Syl. ¶ 5, 5 P.3d 502 (2000).

*Discussion*

The district court provided the following supplemental instruction with the consent of counsel:

"This Instruction is offered to help you make a decision, not to force you to reach a verdict or to suggest what your verdict should be.

"It may be helpful for you to identify areas of agreement and areas of disagreement. You may then wish to discuss the law and the evidence as they relate to areas of disagreement.

"If you still have disagreement, I invite you to identify for me any issues or questions about the evidence, the final instructions of law, or the deliberation process with which you would like assistance from me or counsel. If you choose this option, please list, in writing, the issues where further assistance might help bring about a verdict.

"To repeat, I do not wish or intend to force a verdict. I am merely trying to answer your apparent need for help. If it might help you reach a verdict, it would be wise to give it a try."

The language in this supplemental instruction is different from the language in PIK Crim. 3d 68.12, which is similar in scope. That instruction provides:

"Like all cases, this is an important case. If you fail to reach a decision on some or all of the charges, that charge or charges are left undecided for the time being. It is then up to the state to decide whether to resubmit the undecided charge(s) to a different jury at a later time. Another trial would be a burden on both sides.

"This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision.

"This does mean that you should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candor.

If at all possible, you should resolve any differences and come to a common conclusion.

"You may be as leisurely in your deliberations as the occasion may require and take all the time you feel necessary." PIK Crim. 3d 68.12.

Although this court has previously approved the use of PIK Crim. 3d 68.12, it has indicated that it is much better to give such an instruction before the case is submitted to the jury for deliberations. See *State v. Whitaker*, 255 Kan. 118, 126-28, 872 P.2d 278 (1994) (citing with approval PIK Crim. 3d 68.12); *State v. Oswald*, 197 Kan. 251, 261, 417 P.2d 261 (1966) ("The practice of lecturing a jury in a criminal case after it has reported a failure to agree is not to be commended and . . . might well be held coercive and erroneous as invading the province of the jury.").

The timing of the supplemental instruction presents a serious problem. The jury had been deliberating for some time and announced that it had reached a verdict on the aggravated assault charge but was split on the attempted premeditated first-degree murder charge. At this point, the district court provided the supplemental instruction, advising the jury that it would be wise to try to reach a verdict. In response, the jury returned a verdict on both charges less than an hour later. Considering this chronology, we cannot confidently state that the instruction did not have the effect of forcing a verdict in this case.

It is true that there are some notable differences between this instruction and PIK Crim. 3d 68.12, namely: (1) that the supplemental instruction does not contain the language stating that if this jury does not resolve the case, another jury may be called on to do so, and an additional trial would be a burden to both sides; (2) that the supplemental instruction does not have any mention of the jurors potentially surrendering viewpoints, but instead focuses on resolving areas of disagreement; and (3) the supplemental instruction states that "it would be wise to give [the instruction's suggestions] a try" if those suggestions "might help you [the jury] reach a verdict," whereas the PIK instruction states that "[i]f at all possible, [the jury] should resolve any differences and come to a common conclusion." PIK Crim. 3d 68.12.

We conclude, however, that these modifications to the language of the PIK instruction do not mitigate the timing of the supplemental instruction. But for this instruction, there is a real possibility that the jury may have returned a different verdict on the attempted premeditated murder charge. Accordingly, we conclude that the instruction given was clearly erroneous and requires reversal.

### (3) Ineffective Assistance of Counsel

Overstreet claims that his defense counsel provided constitutionally defective representation when counsel failed to locate one potentially exculpatory witness and failed to adequately prepare another potentially exculpatory witness for trial. Because one of Overstreet's principal defenses was that he was not present at the time the shooting took place, Overstreet argues that the failure of his counsel to subpoena and prepare exonerating witnesses was so prejudicial as to deprive him of a fair trial.

The Sixth Amendment to the United States Constitution guarantees in "all criminal prosecutions" that "the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." This court has explained that the right to counsel guaranteed by this provision is the right to effective assistance of counsel. *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985) (adopting the standards set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052 [1984]).

To support a claim of ineffective assistance of counsel, a defendant must demonstrate (1) that counsel's performance was deficient, and (2) that counsel's deficient performance was sufficiently serious to prejudice the defense and deprive the defendant of a fair trial. *State v. Gleason*, 277 Kan. 624, 643, 88 P.3d 218 (2004). Thus, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. [Citations omitted.]" *Bledsoe v. State*, 283 Kan. 81, 90, 150 P.3d 868 (2007).

*Bledsoe* explained the two steps in the ineffective assistance of counsel analysis in detail, stating:

"The first prong of the test for ineffective assistance of counsel requires a defendant to show that counsel's representation fell below an objective standard of reasonableness, considering all the circumstances. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. We must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [Citation omitted.]

"Once a defendant has established counsel's deficient performance, the defendant also must establish prejudice by showing that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. [Citation omitted.]" 283 Kan. at 90-91.

## Discussion

Overstreet originally raised his claim of ineffective assistance of counsel in a posttrial, pro se motion for a new trial. The defendant listed numerous bases in that motion for his claim that counsel was constitutionally defective, including (1) that counsel failed to subpoena Bauder and Mott—the two individuals who had witnessed the shooting from another truck in the apartment complex parking lot; (2) that counsel failed to prepare Bauder for trial when he was located, evidenced by Bauder's confusion at trial as to whom he had identified as the driver on the night of the incident; (3) that the attorney did not show photographs of Walker, Agnew, and Shears—the other men allegedly involved—to the jury or to Bauder; and (4) that counsel did not object to McCall's statement that the driver of the Tahoe looked like the rapper Chingy or offer a picture of the rapper into evidence for the jury's comparison.

In his petition for review, Overstreet only renews his arguments regarding his counsel's failure to locate Mott and failure to adequately prepare Bauder as a witness.

The district court initially denied Overstreet's motion summarily at the sentencing hearing. The Court of Appeals subsequently remanded the case for a hearing on the defendant's claims of ineffective assistance of counsel, finding the record inadequate to assess the court's decision. On remand, the court held an evidentiary

hearing at which defense counsel—Bradley Sylvester—testified. At the close of Sylvester's testimony, the district court found Overstreet's claims were without merit and again denied his motion.

During opening statements at trial, defense counsel indicated that Joshua Bauder indicated when questioned on the night of the shooting that James Walker was the shooter and that Tyler Mott had identified Kendrick Shears as the shooter and Walker as the driver.

Detective Reynolds later testified that three men were apprehended the night of the shooting: Shears, Walker, and Ishmel Agnew. The detective also testified that Bauder and Mott had witnessed the shooting from a nearby truck. When defense counsel asked whether Bauder or Mott had identified anyone as the perpetrators, the court sustained the State's objection based on hearsay. Defense counsel later asked whether a live identification had been made on the night of the incident, and the court again sustained an objection on hearsay grounds.

After lunch on the first day of trial, defense counsel indicated to the court that he was "actually trying to find Joshua Bauder and Mr. Mott" but was having difficulty because "they've moved about." The court granted a continuance until the next day to allow defense counsel time to find the witnesses.

On the following morning, Bauder testified that he saw the shooting while sitting with Mott in Bauder's truck. Bauder explained that he viewed three people at the police station from about 20 feet away when identifying the shooter and the driver. He also testified that Mott gave an identification separate from Bauder.

When defense counsel asked Bauder if he recalled seeing Overstreet on the night of the shooting or in photographs, the following exchange took place:

"A. I saw him that night when they identified us at the cars.
"Q. You saw him that night when they identified—I'm sorry, say that again.
"A. When they—when the cops took us to identify them, I believe I saw him.
"Q. Okay. Is he the one you identified as something, or do you know?
"A. It's been so long."

Defense counsel immediately recalled Detective Reynolds as a witness, who testified that Overstreet was not present at Bauder's

lineup and that Bauder had identified Shears as the shooter and Walker as the driver.

Defense counsel did not call any other witnesses on Overstreet's behalf.

During the hearing on remand, defense counsel testified that in preparing for trial, he reviewed police reports that indicated that Bauder and Mott were at the scene and were the only two witnesses of the shooting (other than the victim, McCall). The reports indicated that three men were caught running through a Wal-Mart. Police brought Bauder and Mott to the police substation to do a lineup, and both witnesses identified Walker as the driver and Shears as the shooter.

Defense counsel testified that he had not had any contact either in person or by phone with Bauder before the start of trial, and he never had any contact with Mott at all. Defense counsel explained that he did not subpoena Bauder or Mott to appear at trial because he thought the State would call them as witnesses.

According to defense counsel's testimony at the remand hearing, an investigator brought Bauder to the courtroom on the second day of trial (at defense counsel's request), and counsel met with Bauder in the courtroom library before Bauder testified. Defense counsel did not show Bauder mugshots of Walker or Shears—the people he had previously identified as being involved in the shooting—and did not give the jury a photograph of these men either. After Bauder testified, defense counsel did not request a continuance or send anyone to find Mott, even though Bauder apparently knew where he could be located.

When asked whether Bauder's misstatement at trial that he saw Overstreet the night of the shooting was prejudicial to Overstreet's case, defense counsel responded that it was "[v]ery much so."

The court ruled that counsel's performance was not deficient, and even if it were, the jury would have convicted Overstreet of the charges based on the evidence presented at trial. The district court found, after listening to Sylvester's testimony, that as defense counsel he did attempt to locate both Bauder and Mott prior to trial by hiring an investigator. The court further found that defense counsel had provided evidence through Detective Reynolds' tes-

timony that Bauder and Mott did not identify Overstreet as the driver on the night of the shooting. Finally, the court found that counsel's performance had not prejudiced the defendant given the evidence against him: McCall's identification of Overstreet as the driver; Overstreet's fingerprints on the outside of the driver's side door; Overstreet's cell phone in the car; and testimony that the Tahoe had been loaned to Overstreet earlier in the evening on the day of the shooting.

The Court of Appeals held that most of these factual findings were supported by the record, but that the district court had erred in finding that Mott's identification of Walker was introduced through other testimony. Instead, the appellate court noted that this evidence had been excluded on the basis of the State's hearsay objections. *Overstreet*, slip op. at 32. Reviewing the record, the Court of Appeals noted that because Overstreet's theory of defense centered on proving that he was not the driver, defense counsel's "negligible efforts" in locating Mott "[tend] to render Sylvester's assistance deficient." Slip op. at 33.

Despite its finding that Overstreet had met the first prong of ineffective assistance of counsel, however, the Court of Appeals held that counsel's deficient representation did not require reversal given the weight of the evidence presented against the defendant. Slip op. at 33.

*Standard of Review*

When an evidentiary hearing has been conducted in the district court on claims of ineffective assistance of counsel, this court determines whether the factual findings of the district court are supported by substantial competent evidence and whether those findings are sufficient to support its conclusions of law. The court's legal conclusions are reviewed de novo. See *Pabst v. State*, 287 Kan. 1, 16, 192 P.3d 630 (2008); *Bledsoe*, 283 Kan. at 91.

*Analysis*

A review of the record illustrates that the Court of Appeals was correct when it concluded that counsel's performance in this case fell below an objective standard of reasonableness. The crux of Overstreet's defense at trial was that he was not the driver during

the shooting. Overstreet's defense counsel had reviewed the police reports and had discovered that both Bauder and Mott identified Walker—not Overstreet—as the driver in this case. Both Bauder and Mott were listed as potential witnesses the State might call in the initial complaint and information.

Defense counsel testified at the hearing on remand that he had hired a private investigator to find and question Bauder and Mott; this investigator was apparently able to contact Bauder but was unable to contact Mott. Because counsel "figured [the State] would call [Bauder and Mott] as witnesses," he "didn't need to contact them." Only when the State did not call either man as a witness and the court granted the State's hearsay objections did defense counsel recognize that he needed to subpoena Bauder and Mott. The only personal contact defense counsel ever had with Bauder before the witness testified was in the courtroom library on the day of Bauder's testimony—more than 8 months after the incident occurred. Bauder then incorrectly stated that he had identified Overstreet on the night of the shooting.

If the primary theory of the defense was that Overstreet was not the driver, then it was objectively unreasonable to not interview the two people who had made positive identifications of another person as the driver on the night of the shooting. It was unreasonable not to subpoena the two men as witnesses prior to trial. It was unreasonable to fail to adequately prepare the one man who eventually did testify. These decisions cannot be strategically explained and fall below the constitutionally-guaranteed standards of representation in a criminal case.

Moreover, contrary to the Court of Appeals' conclusion, we conclude that defense counsel's deficient performance prejudiced the defendant's right to a fair trial. On two separate occasions after the case was submitted to the jury for deliberations, the jury asked for a readback of Bauder's testimony regarding whether he saw Overstreet at the scene of the shooting. The jury also asked for a readback of McCall's testimony regarding his identification of Overstreet as the driver. When the jury requested additional summation on the second day of deliberations, one of the questions of

clarification requested was whether Overstreet had to be the driver of the Tahoe to be convicted of aiding and abetting the two crimes.

In light of the record, there is a real possibility that but for counsel's deficient performance in this case, the jury would have returned a different verdict. In order to protect Overstreet's Sixth Amendment right to counsel, we reach the merits of this issue, reverse his convictions, and remand the case for a new trial.

Overstreet raised a number of other arguments on appeal. We have addressed the errors leading to reversal of the defendant's convictions. In light of our decision, we need not address Overstreet's other allegations of error. The decision of the Court of Appeals affirming the district court is reversed, the decision of the district court is reversed, and the case is remanded for a new trial.