NOT DESIGNATED FOR PUBLICATION

No. 117,908

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ANTHONY EUGENE KELLEY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; STEPHEN J. TERNES, judge. Opinion filed November 30, 2018. Affirmed.

*Carl F.A. Maughan*, of Maughan Law Group LC, of Wichita, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., BUSER and SCHROEDER, JJ.

PER CURIAM: Anthony E. Kelley appeals from his convictions for aggravated burglary, aggravated robbery, and kidnapping. On appeal, Kelley contends that the evidence presented at trial was insufficient to establish that he had the requisite criminal intent to commit aggravated robbery. Additionally, Kelley contends that questions from the jury regarding the safety of the jurors show that the jury was prejudiced against him and that a mistrial should have been declared. Because we find none of Kelley's contentions persuasive, we affirm his convictions.

1

FACTS

Since 1989, Kelley has been in the custody of the Kansas Department of Corrections serving consecutive sentences of life in prison for first-degree murder and 15-20 years in prison for aggravated burglary. See *Kelley v. State*, No. 93,525, 2005 WL 3098355 (Kan. App. 2005) (unpublished opinion). Although he was incarcerated at the El Dorado Correctional Facility at the time the crime was committed, Kelley was convicted of orchestrating a kidnapping, aggravated robbery, and aggravated burglary arising out of a home invasion in Wichita that lasted approximately 20 hours in December 2015.

On December 2, 2015, an assistant manager at Hewitt Davis' place of employment became concerned about his 65-year-old employee. The assistant manager was worried because Davis—a long-time and punctual employee—failed to show up for work that morning. After unsuccessfully attempting to reach Davis by telephone, the assistant manager called the Wichita police around 8:30 a.m. to ask them to do a wellness check at Davis' home. Officer Luis Franco responded to the call.

When Officer Franco arrived at Davis' residence, he noticed a green vehicle with California license plates backed into the driveway behind another vehicle. Officer Franco approached the house and a man who identified himself to be Jerome Mitchell-Bey came to the door. Mitchell-Bey told Officer Franco that Davis was "in [his] custody." Mitchell-Bey showed the officer paperwork that purportedly authorized Davis' arrest.

Upon entering Davis' house, Officer Franco noticed four or five men wearing flak jackets and gun belts with empty holsters. The men told Officer Franco that they had no guns on them but that they had confiscated Davis' firearms. Concerned for his own safety as well as for the safety of Davis, Officer Franco called for backup. Officer Renay Bryand was the first to answer Officer Franco's call for assistance at Davis' home. Subsequently, other officers also arrived at the scene.

In speaking to Davis—who was found in a back bedroom lying on a bed wearing an oxygen mask—Officer Franco learned that the men had confronted Davis in his driveway the previous afternoon, had placed him in handcuffs, and would not let him leave his house. Davis told the police that he believed that Kelley—who is the son of Davis' deceased wife—orchestrated the home invasion from prison. Davis indicated that the men initially kept him handcuffed in a living room chair before moving him to his bedroom.

Davis told the police that the men claimed his house was "Mufti Corp Moorish Temple" property. He also stated that Mitchell-Bey had threatened him with a stun gun during the ordeal and stated that "this was going to be his worst nightmare." According to Davis, Mitchell-Bey seemed to be in charge and did most of the talking for the men who seized him.

Mitchell-Bey provided Officer Franco with documents that indicated that Kelley had appointed him to serve as an agent of the "Mufti Law Enforcement Agency" and had authorized the "arrest" of Davis. The police also found several bags of personal property in the house. In one of the bags, the officers found several guns that belonged to Davis. According to Officer Bryand, Davis told him that in addition to taking his firearms, the men had taken his wallet, house key, car keys, and other items of personal property.

During the investigation, the police learned that Davis and Ruth Greer were in a relationship for 29 years prior to her death in 2012. Davis told investigators that he considered Greer to be his common-law wife. According to Davis, he and Greer also had visited Kelley at El Dorado Correctional Facility on Sundays and would often purchase snacks or other items for him. In addition, Davis said that he continued to provide Kelley $50 a month for a period time after Greer's death because she wanted him "to look after her son."

Investigators obtained a warranty deed for Davis' house dated October 28, 2003. The warranty deed listed Greer and Davis "as joint tenants . . . [w]ith the rights of survivorship and not as tenants in common." The warranty deed did not list Kelley or the "Mufti Corp Moorish Science Temple" as having an ownership interest in the house. Davis told the police that he believed that after Greer's death, he became the sole owner of the property.

On December 3, 2015, Sergeant Lee Eisenbise of the Wichita Police Department went with an FBI Agent to interview Kelley at the El Dorado Correctional Facility. After he was given his *Miranda* rights, Kelley agreed to speak to the officers. During the recorded interview, the officers learned that Kelley had contacted both Mitchell-Bey and Samuel Gomez by phone while they were at Davis' house. Moreover, Kelley made several incriminating comments regarding his involvement in the home invasion, including the following:

- "I'm responsible because I am the one who sent those particular officers to arrest [Davis], and I have also instructed them to go to the county courthouse."
- "I employ these gentlemen."
- "I instructed them to hold [Davis] on the premises until we could sort everything out."
- "I commissioned Mitchell-Bey."
- "This was an opportunity to check the legal religity of kingdom law."
- "Q: So this was a test to see if you have this legal authority . . . ? A: Right."
- "Q: How did these guys get the things that they used? How did they get these uniforms, how did they get these belts? Stun guns? A: I purchased it—the gear. Q: You purchased it? A: Yeah. Q: How did you purchase

4

that from in here? A: You would be surprised what you can purchase in here."

- "At different times, I ordered stun guns, collapsible batons, duty belts, uniforms, patches, and maybe a multiknife for something, gloves, berets, helmets."
- "First thing they were supposed to do is gain entry into the house. After that, they were to arrest Hewitt L. Davis."
- "My basic job, this right here, is to take the hit . . . . If we're wrong, I'm responsible."
- "If they want the person that's responsible, it's me."

On December 7, 2015, the State filed a complaint against Kelley and the men arrested at Davis' home. The complaint was subsequently amended. Ultimately, Kelley was charged with committing the crimes of kidnapping, aggravated burglary, and aggravated robbery. A preliminary hearing was held on May 11, 2016, at which Kelley was bound over for trial. In December 2016, a jury trial was commenced in district court. At trial, Kelley represented himself and Steven Wagle served as his standby counsel.

During the trial, the State presented the testimony of six witnesses in its case-in-chief and one rebuttal witness. Specifically, the State called Henry Winsor, Officer Luis Franco, Officer Renay Bryand, Hewitt L. Davis, Forensic Examiner Nancy Jamal Bara, Sergeant Lee Eisenbise, and Lieutenant Todd Ojile as witnesses. In addition, the State introduced 38 exhibits that were admitted into evidence and played the video recording of Sergeant Eisenbise's interview of Kelley for the jury.

In his defense, Kelley presented the testimony of four witnesses. In addition to testifying on his own behalf, Kelley called Inmate Mark Agnew, Wichita City Attorney Sharon Dickgrafe, and Attorney John Peter Orsi as witnesses. Kelley also introduced 11 exhibits that were admitted into evidence.

5

At trial, Davis testified about the events that began on December 1, 2015, in his driveway. Among other things, Davis testified that he did not give any of the men permission to enter or remain in his house. Davis also testified that the personal property taken from his person was removed without his permission and that he was denied access to it while the men were in his house. Likewise, Davis testified that he complied with the demands made by the men because of the threats they made and because of the stun gun. Finally, Davis testified that at no point during the ordeal did he feel free to leave his house.

Kelley told the jury that he took "full responsibility for the actions" of the men who were physically present during the home invasion because they acted under his "command." Nevertheless, Kelley argued that the actions taken by the men were not illegal. Through his testimony, Kelley attempted to establish that Davis' house actually belonged to him and/or the "Mufti Corp Moorish Temple" that he headed. Kelley described himself as the "King" of the organization and indicated that Davis' house is listed as its headquarters on documents filed with governmental agencies.

Kelley admitted that he hired Mitchell-Bey and Gomez to undertake what he called the "arrest" of Davis. He also admitted to ordering the uniforms, duty belts, and the other paramilitary gear used during the incident. Kelley argued that anyone associated with the "Mufti Corp Moorish Temple" should have the authority to "enter into the building" and that he had given the men "permission" to do so. Kelley further admitted that he talked to the men several times while they were in the house to provide instruction. According to Kelley, any items collected at Davis' house were legally "seized, tagged, and bagged."

Kelley testified that he did not "feel [he had] done anything illegal or wrong." Nevertheless, on cross-examination, he agreed that he sent the men "to take control of that house" and that he "sent [them] with handcuffs" so that they could "cuff and detain

6

Hewitt Davis." He also agreed that he "wanted [Davis] to be held in that house for a minimum of 72 hours."

During jury deliberations, the district court received two questions from the jury. First, the jury asked: "How can the safety of the jury be guarded/protected as a result of their work from the defendant and his witnesses and his organization?" Second, the jury inquired: "Who are the individuals in the gallery during closing arguments, and are the co-conspirators in jail? Some of the jurors are single and concerned about their personal safety." After asking both the State and Kelley their opinions on how to respond to the jury's questions, the district court decided to simply respond by writing: "[Y]our verdict should be based only on the facts and evidence presented in open court. I will leave it at that."

Subsequently, the jury found Kelley guilty of kidnapping, aggravated robbery, and aggravated burglary. At sentencing, the district court denied Kelley's motion for acquittal and motion for a new trial. The district court then sentenced him to 247 months for the kidnapping conviction, 61 months for the aggravated robbery conviction, and 34 months for the aggravated burglary conviction, totaling 342 months. These sentences were imposed consecutive to one another and consecutive to "any and all [prior] convictions." Thereafter, Kelley timely filed a notice of appeal.

ANALYSIS

*Sufficiency of the Evidence*

Kelly's first contention on appeal is that the jury lacked sufficient evidence for the three guilty verdicts. In determining if there was sufficient evidence presented at trial, we review "the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt." *State v.*

7

*Rosa*, 304 Kan. 429, 432-33, 371 P.3d 915 (2016). In doing so, we must "not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility." *State v. Dunn*, 304 Kan. 773, 822, 375 P.3d 332 (2016).

Kelley argues that there was insufficient evidence to convict him of aiding and abetting the crimes of aggravated robbery, aggravated burglary, and kidnapping. Because he was incarcerated at the time of the incident that led to the charges, Kelley recognizes that "the State clearly charged [him] under an aiding and abetting theory." "[F]or a defendant to be convicted of a specific-intent crime on an aiding and abetting theory, that defendant must have the same specific intent to commit the crime as the principal." *State v. Overstreet*, 288 Kan. 1, 13, 200 P.3d 427 (2009).

Kelley submits that "[t]he questions at issue are:  whether Mr. Mitchell-Bey and his companions intended to commit a robbery therein; and whether Mr. Kelley had the same mens rea [criminal intent] as the actual perpetrators did at the time that they actually entered the building." He also suggests that if there was no intent to commit aggravated robbery, there can be no specific intent to commit aggravated burglary. In turn, he makes a similar argument regarding the kidnapping charge. In particular, Kelley argues that the kidnapping charge is based on an intent to commit aggravated burglary that in turn "was predicated upon the crime of robbery which requires an intent to permanently deprive Mr. Davis of his property."

"Robbery is knowingly taking property from the person or presence of another by force or by threat of bodily harm to any person." K.S.A. 2017 Supp. 21-5420(a). A robbery becomes aggravated robbery "when committed by a person who:  (1) is armed with a dangerous weapon; or (2) inflicts bodily harm upon any person in the course of such robbery." K.S.A. 2017 Supp. 21-5420(b)(1) and (2). As the Kansas Supreme Court has held, "robbery and aggravated robbery are general intent, not specific intent crimes. In order to prove the elements of [these] crimes, the State need only prove that a

8

defendant took property from the person or presence of another by force or by threat of bodily harm to any person." *State v. Edwards*, 299 Kan. 1008, Syl. ¶ 2, 327 P.3d 469 (2014). In other words, a defendant has completed the crime of robbery or aggravated robbery "when the individual takes possession of the property, because asportation [the carrying away of someone else's property] is no longer required to complete the crime." 299 Kan. at 1015.

On the other hand, aggravated burglary is entering into or remaining in a dwelling in which there is a human being—without authority—"with intent to commit a felony, theft or sexually motivated crime therein." K.S.A. 2017 Supp. 21-5807(b)(1). Unlike robbery and aggravated robbery, aggravated burglary is a specific intent crime. See *State v. Makthepharak*, 276 Kan. 563, 572, 78 P.3d 412 (2003). Consequently, to constitute aggravated burglary, the State must establish that a defendant had a specific intent to enter a dwelling where there is a human being with the intent to commit a felony or theft.

Similarly, kidnapping is a specific intent crime. K.S.A. 2017 Supp. 21-5408(a)(2) provides that kidnapping "is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person . . . to facilitate . . . the commission of any crime." In particular, kidnaping "requires the perpetrator to effect the restraint or confinement by force, threat, or deception with the specific intent to accomplish a particular illegal purpose." *State v. Ramirez*, 299 Kan. 224, 231, 328 P.3d 1075 (2014).

Here, a review of the record reflects evidence that Mitchell-Bey, Gomez, and the others present in Davis' home took possession of various items of personal property belonging to Davis without his permission. In addition to the personal property taken from Davis, the men compelled him to sign a document purportedly signing his house over to Kelley's organization. The record also reveals that the men threatened Davis with a stun gun and made comments that he perceived to be threatening in nature. Specifically,

9

Davis testified that Mitchell-Bey threatened him with a stun gun or taser and told him that if he did not cooperate that this would be his "worst nightmare."

> "Q: When they took your property from you, that being your wallet, your rings, your medication, your watch, did they actually take it from your presence?
> "A: They had me empty out my pockets, yes.
> "Q: So do you have access to it any longer?
> "A: No.
> "Q: Okay. Did you give them permission to take those items—but for the stun gun and their statements to you?
> "A: No."

As indicated above, removing the property from Davis' house is not required to complete the crime of robbery or aggravated robbery. Hence, we find that the evidence presented at trial regarding the men taking these items of personal property from Davis without his permission—combined with the evidence of Davis being handcuffed, threatened with a stun gun, and prevented access to the property—is sufficient to establish that the aggravated robbery was completed. See *Edwards*, 299 Kan. at 1015. A review of the record also reveals that Kelley admitted to instructing the men to "seize" certain personal property at Davis' house. Based on this evidence, a reasonable fact-finder could conclude that Kelley sent the men to Davis' house with the intent to take property from Davis by force or by threat of bodily harm and the men carried out his orders.

Regarding the specific intent necessary to commit aggravated burglary, the record reveals that Kelley sent the men to the house to seize Davis, to confine him for up to 72 hours, and to seize specific items of property. The evidence also shows that the men took large duffel bags with them to the house in order to store the items they were going to

10

seize. Based on this evidence, a reasonable fact-finder could conclude that Kelley sent the men to Davis' house with the specific intent to seize Davis in order to commit a felony or theft and that the men carried out his orders.

Finally, we find sufficient evidence in the record to support the requisite specific intent to commit the crime of kidnapping. During Kelley's interview and trial testimony, he made several statements indicating that he directed his men to seize and confine Davis. See, e.g., ("I am the one who sent those particular officers to arrest"); ("I instructed them to hold [Davis] for a minimum of 72 hours"); ("First thing they were supposed to do is gain entry into the house. After that, they were to arrest Hewitt L. Davis. After arrest, [they] were to hold him in the basement."). Likewise, Davis testified that he was placed in handcuffs and later confined to his room while a guard stood at the doorway. Based on this evidence, a reasonable fact-finder could conclude that Kelley sent the men to Davis' house with the specific intent to seize and confine Davis against his will in order to commit a crime and that the men carried out these orders.

We, therefore, conclude that there is sufficient evidence in the record upon which a fact-finder could determine that Kelley was guilty beyond a reasonable doubt of aiding and abetting in aggravated robbery, aggravated burglary, and kidnapping.

*Questions from Jury*

During deliberations, the district court received a note from the jury that asked: "How can the safety of the jury be guarded/protected as a result of their work from the defendant and his witnesses and his organization?" and "Who are the individuals in the gallery during closing arguments, and are the co-conspirators in jail? Some of the jurors are single and concerned about their personal safety." Kelley contends that "the court ought to have either declared a mistrial or, in the alternative, instructed the jury that they should consider the case without sympathy or prejudice to any party in accordance with

11

P.I.K. 3d 51.07." According to Kelley, the jury's questions proved that "their deliberations have been tainted by fear and prejudice" and showed "blatant prejudice by the jury toward the defendant."

After the jury inquired as to how the individual jurors would remain safe, the prosecutor stated that the questions should probably be answered

> "something to the effect of the jury should not consider anything other than the evidence that was presented in open court in arriving at their decision. Any questions that are not related to the facts and evidence in the case should not be considered and can be I guess addressed at the conclusion of their deliberations."

Kelley responded, "I would not know how to answer something like that. I'd have to say just what [the prosecutor] said. I don't get it." The district court modified the prosecutor's suggestion slightly and responded to the jury: "[Y]our verdict should be based only on the facts and evidence presented in open court." The district court then asked to confirm this instruction with Kelley by asking "Mr. Kelley, anything else, sir?" Kelley responded by shaking his head and saying, "No, no, Your Honor."

The record reflects that the district court provided Kelley with the opportunity to not only suggest a response to the jury's questions but also to edit and provide feedback to its answer. Yet on appeal, Kelley now claims this instruction was error. Kelley agreed to the court's verbiage for the jury question response. He did not object when the questions arose and agreed with both the prosecutor's and the court's language.

Notwithstanding, Kelley argues on appeal that district court's failure to provide additional guidance to the jury or to declare a mistrial was error. Even so, Kelley failed to provide any authority to support this contention. Kelley simply suggests that "the court ought to have either declared a mistrial or . . . instructed the jury that they should consider the case without sympathy or prejudice to any party in accordance with P.I.K. 3d 51.07."

12

However, as Kelley acknowledges, "the instruction which originally appeared at P.I.K. 3d 51.07 is longer recommended" as it "was disapproved for general use in *State v. Harmon*, 254 Kan. 87, 865 P.2d 1011 (1993), and . . . *State v. Maggard*, 26 Kan. App. 2d 888, 995 P.2d 916 (2000)." Kelley suggests that the instruction is still permitted "in certain factual circumstances in which the jury may be influenced by sympathy or prejudice" but fails to elaborate on what those circumstances may be. Thus, we do not find that the district court erred in how it responded to the jury's questions.

Moreover, even if we did find that the district court erred, the error would be harmless under the circumstances presented. Error is harmless when the error "did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome." *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012). Here, the record is replete with statements by Kelley implicating himself in the crimes. He proudly took responsibility for orchestrating the events that took place at Davis' home on December 1 and 2, 2015. He simply argued that what occurred was not illegal. Thus, it is unlikely that the district court's response to the questions from the jury changed the outcome of the case.

Furthermore, we do not agree with Kelley's assertion that the jury questions proved the jury was prejudiced against him. Kelley argues that the questions "demonstrated [the jury's] prejudice against the defendant, not based upon the evidence against him, but based upon fear of him." Kelley's argument is at best speculative. Although some jurors may have raised safety concerns, there is no showing that these concerns resulted in the jurors violating their oaths to decide the case based on the evidence presented at trial.

Affirmed.

13