NOT DESIGNATED FOR PUBLICATION

No. 116,535

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LESLIE D. PRUITT,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; TERRY L. PULLMAN, judge. Opinion filed May 11, 2018. Affirmed.

*Kimberly Streit Vogelsberg*, of Kansas Appellate Defender Office, for appellant.

*Julie A. Koon*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before ARNOLD-BURGER, C.J., BUSER and SCHROEDER, JJ.


BUSER, J.:  This is a direct appeal by Leslie D. Pruitt, who was convicted by a jury of multiple violent felony offenses relating to a shooting that occurred on March 6, 2015, in Wichita. On appeal, Pruitt raises four issues. First, he asserts the combined aiding and abetting and reasonable foreseeability instruction provided to the jury was improper. Second, Pruitt claims error because the district court allowed evidence of gang affiliation at trial. Third, he asserts the district court lacked jurisdiction to modify his jail time credit after sentencing and improperly ordered him to pay restitution. Finally, Pruitt contends the district court violated *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L.

1

Ed. 2d 435 (2000), when it considered his criminal history to enhance his sentences. Finding no reversible error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On the evening of March 6, 2015, David Simonton drove a semitrailer truck to a local Sam's Club to make a delivery. His cousin, Craig Wolfe, accompanied him on the delivery. Upon detaching the trailer, the two men planned "[t]o find a club [and] get some weed" that evening. Simonton drove the cab to a nearby Walmart and purchased a small quantity of marijuana from some individuals. Simonton then encountered three men in the parking lot, later identified as Pruitt, Dreamis Webster, and Mondrell Pruitt, and he asked about purchasing some marijuana. Webster told Simonton he could find some marijuana. Simonton and Pruitt then exchanged phone numbers, and Pruitt, Webster, and Mondrell went to Pruitt's home. Of note, Mondrell testified as a State's witness at trial.

Unbeknownst to Simonton, Pruitt and Webster did not intend to sell him marijuana. Instead Pruitt, Webster, and Pruitt's mother discussed "ripping off" Simonton and Wolfe by robbing them. After Simonton and Pruitt talked by phone, the men agreed to meet at Walmart to consummate what Simonton understood would be his purchase of marijuana. According to Mondrell, Pruitt drove his car with the other two men as passengers to the front of Walmart. At that time Pruitt was armed with a semiautomatic handgun and Webster had a revolver.

Upon the men's arrival at Walmart, Simonton was seated in the driver's seat of the truck's cab with Wolfe in the passenger's seat. Pruitt informed Simonton that he "didn't want to do a deal in front of Wal-Mart," and he drove behind an adjacent building. Simonton and Wolfe followed in the cab.

2

Simonton parked his vehicle and allowed Pruitt and Webster to enter the truck's cab. Simonton showed the men $50 he had to purchase marijuana. Shortly thereafter, Webster brandished his revolver while demanding Simonton's money. Pruitt also displayed his semiautomatic firearm. A scuffle ensued inside the cab, during which Webster initially pointed his revolver at Wolfe's head and then at Simonton. At some point, Pruitt left the cab.

While Webster tussled with Simonton and Wolfe inside the truck's cab, Pruitt went around to the driver's side of the cab and attempted to open the driver's side door. During this encounter, Webster recalled the driver's side door swinging open and shut. When Simonton continued to resist, Wolfe heard Pruitt yell to Webster, "[Expletive] it, shoot them." Wolfe then saw Webster fire two shots at Simonton from "[n]ot even a foot." Wolfe then heard a third, "kind of muffled" shot which did not come from Webster's revolver. In total, Simonton sustained three gunshot wounds:  one to the right side of his face, another to his right shoulder, and one to his left lower abdomen.

After the shooting, investigating police officers searched the area and found one casing from a semiautomatic firearm about 150 to 200 feet from the truck's cab. As a consequence of the shooting, Simonton sustained a cervical spinal cord injury which resulted in paraplegia. He testified, "I will never be able to walk again."

After his arrest, and upon being advised of his *Miranda* rights, Pruitt was interviewed by Detective William Crowe. Initially, Pruitt related that he had gone to Walmart on the night of the shooting to purchase a video game controller. Pruitt recalled that he had talked to a man in a semitrailer truck who inquired about purchasing marijuana. Pruitt told the detective that he told the man he did not know. Pruitt also told Detective Crowe that he did not sell marijuana. After this conversation, Pruitt said Webster and another unknown man talked to the truck driver while Pruitt remained in the car. The men then left the Walmart parking lot. Upon returning to his residence, Pruitt

3

told Detective Crowe that he played video games, put his child to bed, and that Webster and the other man left the house for a while. According to Pruitt, however, he did not leave the residence the rest of the evening.

After listening to Pruitt's exculpatory account, Detective Crowe confronted him with incriminating evidence from a surveillance camera which placed him at the scene of the shooting. Upon being challenged, Pruitt advised the detective that he was going to tell him what really happened. Pruitt admitted that the group had arranged to sell Simonton marijuana. Upon their return to Walmart, Pruitt acknowledged entering the truck's cab and talking to Simonton to insure that he had money for the drug deal. After advising Webster that the driver had money, Pruitt said he left the truck and reentered his automobile where he remained for the duration of the incident.

Pruitt advised that Webster entered the truck's cab, he heard two shots, and Webster left the cab. Pruitt reported that from inside his car he could not see what transpired inside the cab. After Webster ran some distance, Pruitt drove over to him and picked him up. According to Detective Crowe, while Pruitt initially said that Webster had a handgun, he later changed his account and said that neither he nor Webster had a handgun that evening.

The State charged Pruitt in a six count complaint:

- Count 1, attempted murder in the first degree, a severity level 1 person felony in violation of K.S.A. 2014 Supp. 21-5301(a) and K.S.A. 2014 Supp. 21-5402(a), on the basis that Pruitt committed an overt act, shot Simonton with a handgun, toward the perpetration of murder in the first degree;
- Count 2, attempted aggravated robbery, a severity level 5 person felony in violation of K.S.A. 2014 Supp. 21-5301(a) and K.S.A. 2014 Supp. 21-

4

5420(b)(1), on the basis that Pruitt committed an overt act, pointed a handgun at Simonton and Wolfe and demanded money, toward the perpetration of aggravated robbery;

- Count 3, aggravated assault, a severity level 7 person felony in violation of K.S.A. 2014 Supp. 21-5412(b)(1), on the basis that Pruitt unlawfully and knowingly placed Wolfe in reasonable apprehension of immediate bodily harm with a deadly weapon, to-wit: a handgun;

- Count 4, criminal possession of a weapon by a convicted felon, a severity level 8 nonperson felony in violation of K.S.A. 2014 Supp. 21-6304(a)(1);

- Count 5, use of a communication facility in an attempt or conspiracy to commit or a criminal solicitation of a drug sale or purchase, a severity level 8 nonperson felony in violation of K.S.A. 2014 Supp. 21-5707(a)(2); and

- Count 6, aggravated battery, a severity level 4 person felony in violation of K.S.A. 2014 Supp. 21-5413(b)(1)(A), on the basis that Pruitt unlawfully and knowingly caused great bodily harm to another, to-wit: Simonton.

At the conclusion of the trial, the jury found Pruitt guilty of the lesser included offense of attempted second-degree murder and the other crimes charged. Pruitt filed a motion for new trial and judgment of acquittal, which the district court denied. The district court sentenced Pruitt to a controlling sentence of 200 months with 36 months' postrelease supervision.

Pruitt filed this appeal.

OBJECTION TO INSTRUCTION NO. 9

On appeal, Pruitt first objects to Instruction No. 9, the combined aiding and abetting and reasonable foreseeability jury instruction the district court provided to the jury. Pruitt argues the instruction "misstated the law, misled the jury, and permitted the

5

jury to convict him of crimes without finding he had the required culpable mental state." The State responds that Pruitt did not sufficiently raise a contemporaneous objection to Instruction No. 9 at trial and that the instruction was legally and factually appropriate.

When reviewing challenges to a district court's jury instruction, Kansas courts follow a multistep analysis:

> "'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless.'" *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015).

With regard to the first step in the analysis, the State complains that Pruitt did not preserve this issue for appellate review. At trial, during the jury instructions conference, the following discussion occurred with regard to Instruction No. 9:

> "[THE COURT]: The next [jury instruction] is aiding and abetting and foreseeability. Two separate instructions but combined into one. Both are straight PIK except one in the second paragraph, specifically to Counts 2, 3, and 6.
> "Any objection?
> "[THE STATE]: No. For the record, the reason why I separated them out like that is because obviously Counts 2, 3, and 6 are general intent crimes and Count 1 is a specific intent crime that requires both individuals to have the same intent.
> "[DEFENSE COUNSEL]: And, Judge, I understand this is PIK, so I know it's completely normal here. But just for what it's worth, I just don't like the way this—the PIK instruction is written. To me it sounds so much like almost felony murder and how it—how it operates. So just for what it's worth, I'm objecting based on that.

"THE COURT: All right. I will note your objection. I will overrule. I think it's appropriate under the circumstances."

On appeal, the State asserts that defense counsel's statement did not constitute a sufficient objection to preserve this issue for appellate review because it was

"general and [defense counsel] did not clarify what he meant by 'it sounds so much like almost felony murder and . . . how it operates.' He did not tell the district court what part of the instruction he believed was similar to felony murder, nor did he explain how the operation of the instruction was objectionable."

Kansas law provides that, absent "an objection stating specific grounds," an appellate court will review jury instructions given at a trial for clear error. *State v. Hammond*, 251 Kan. 501, 509, 837 P.2d 816 (1992). Here, although defense counsel generally objected to Instruction No. 9, he never specified what part of the instruction's language was objectionable and why it was legally or factually improper. Rather, he described the instruction as "completely normal" but that he did not like the way the combined PIK instruction was written. His comment that the wording was "so much like almost felony murder" does not clarify the basis for the objection. Moreover, defense counsel's vague complaint bears no resemblance to the argument Pruitt now raises on appeal.

Because Pruitt did not raise a specific objection to Instruction No. 9 at trial, we will review the district court's ruling for clear error. See *State v. Cameron*, 300 Kan. 384, 388, 329 P.3d 1158 (2014). As a consequence, Pruitt "'must firmly convince [this court] that the giving of [a different] instruction would have made a difference in the verdict.'" *State v. Soto*, 301 Kan. 969, 984, 349 P.3d 1256 (2015).

The second and third steps of the analysis consider the legal and factual appropriateness of a challenged instruction, employing an unlimited review of the entire

7

record. See *State v. Plummer*, 295 Kan. 156, 161-63, 283 P.3d 202 (2012). Pruitt contends the combination of the two instructions as part of a single jury instruction misstated Kansas law and confused the jury. Accordingly, we will consider the legal appropriateness of Instruction No. 9, which provided:

"A person is criminally responsible for a crime if the person, either before or during its commission, and with the mental culpability required to commit the crime intentionally aids another to commit the crime or advises, hires, counsels, [or] procures another to commit the crime.
"As to Counts 2, 3, and 6:
"The person is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the person could reasonably foresee the other crime as a probable consequence of committing or attempting to commit the intended crime."

As noted above, Count 2 charged Pruitt with attempted aggravated robbery; Count 3 charged Pruitt with aggravated assault; and Count 6 charged Pruitt with aggravated battery.

Pruitt contends Instruction No. 9 "failed to reflect Kansas law," specifically K.S.A. 2014 Supp. 21-5210. In relevant part, that statute provides:

"(a) A person is criminally responsible for a crime committed by another if such person, acting with the mental culpability required for the commission thereof, advises, hires, counsels or procures the other to commit the crime or intentionally aids the other in committing the conduct constituting the crime.
"(b) A person liable under subsection (a) is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by such person as a probable consequence of committing or attempting to commit the crime intended." K.S.A. 2014 Supp. 21-5210.

8

The language of this law is reflected verbatim in PIK Crim. 4th 52.140 (2016 Supp.), which in turn, the district court incorporated into Instruction No. 9.

Although Pruitt acknowledges Instruction No. 9 "accurately reflected" K.S.A. 2014 Supp. 21-5210(a), he claims it did not correctly provide the requirements of subsection (b). In particular, he complains that Instruction No. 9 did not state that before considering whether the crime was reasonably foreseeable, the jury must find that the top half of the instruction applied, which required it to find Pruitt had the required mental culpability and intentionally aided another to commit the intended crime. "This is problematic," Pruitt believes, because "it is not clear whether counts 2, 3, and 6 are referenced as the reasonably foreseeable crimes or the intended crimes." Thus, according to Pruitt, "the jury could have convicted [him] under a theory of aiding and abetting for an intentional killing without ever finding [he] did in fact have the intent to kill."

In a multifaceted response, the State argues that the prosecutor

"explained to the court that the first paragraph of the instruction applied only to count 1 (attempted first degree murder) because it was a specific intent crime that required both individuals [Pruitt and Webster] to have the same intent to commit the crime. The second paragraph of the instruction referred to counts 2, 3, and 6."

Second, the State notes that Instruction No. 9 is a mirror image of PIK Crim. 4th 52.140, which combined former PIK Crim. 3d 54.05 and PIK Crim. 3d 54.06. Third, the State points out that the second paragraph to Instruction No. 9 begins: "The person is *also* responsible for any other crime committed in carrying out or attempting to carry out the *intended* crime." (Emphasis added.) Thus, the State asserts that the words "also responsible" immediately following the first paragraph and the phrase: "As to Counts 2, 3, and 6" make it clear that a person liable under the first paragraph for attempting to murder Simonton (Count 1) was also liable for crimes listed in Counts 2, 3, and 6, if that

9

person could reasonably foresee those crimes would occur as a consequence of committing the intended crime—attempted murder.

Pruitt cites two premeditated murder cases in support of his argument. First, he cites *State v. Engelhardt*, 280 Kan. 113, 119 P.3d 1148 (2005). In *Engelhardt*, the defendant was convicted of first-degree premeditated murder under an aiding and abetting theory. 280 Kan. at 120. The district court instructed the jurors by giving them separately PIK Crim. 3d 54.05 (Responsibility for Crimes of Another) and PIK Crim. 3d 54.06 (Responsibility for Crimes of Another—Crime Not Intended). According to our Supreme Court, the district court believed the two instructions were appropriate because the victim had been beaten and stabbed by both Engelhardt and his accomplice prior to the infliction of the "death blows." As a result, the district court surmised, in the context of aiding and abetting the crime, the murder was reasonably foreseeable. 280 Kan. at 133.

Our Supreme Court found instructional error, however, because by instructing the jury on PIK Crim. 3d 54.06 in a premeditated murder case, the district court effectively and erroneously allowed the jury to find Engelhardt guilty of felony murder. 280 Kan. at 133. Of note, our Supreme Court did not reverse Engelhardt's conviction, finding the instructional error to be harmless. 280 Kan. at 133-34.

As is readily apparent, *Engelhardt* is not factually on point with the case on appeal. It does, however, stand for an important proposition:

> "The specific intent required to be proved for conviction on a premeditated first-degree murder charge is premeditation. Therefore, under K.S.A. 21-3205(1), a person guilty of aiding and abetting a premeditated first-degree murder must be found, beyond a reasonable doubt, to have had the requisite premeditation to murder the victim." 280 Kan. at 132.

10

This proposition is equally applicable here, where Pruitt was charged with attempted murder in the first degree but was convicted of the specific intent crime of second-degree murder. See *State v. Littlejohn*, 298 Kan. 632, 647, 316 P.3d 136 (2014) ("Second-degree intentional murder is a specific-intent crime requiring the defendant to have the specific intent to kill.").

Pruitt also cites *State v. Overstreet*, 288 Kan. 1, 11, 200 P.3d 427 (2009). In *Overstreet*, our Supreme Court once again considered the propriety of the district court's reasonable foreseeability instruction in an attempted premeditated first-degree murder case based on an aiding and abetting theory. In *Overstreet*, our Supreme Court noted:

> "This foreseeability instruction indicated that the jury need not find that Overstreet possessed the specific intent of premeditation if it found that premeditated murder was a reasonably foreseeable consequence of aggravated assault. In other words, giving the aiding and abetting foreseeability instruction negated the State's burden to prove an essential element of the crime charged: premeditation." 288 Kan. at 11.

Ultimately, the Supreme Court determined that, as written, the jury instruction was clearly erroneous and remanded the case for new trial. 288 Kan. at 14-15. Of note, in reversing this conviction our Supreme Court emphasized the prosecutor's closing argument where he erroneously argued that Overstreet was guilty of aiding and abetting premeditated murder "'*even if this defendant only wanted to aid an aggravated assault*.'" 288 Kan. at 14.

In the present case, Pruitt argues that Instruction No. 9 "negated the jury's duty to find that [he] had the required mental culpability and specific intent to be guilty of attempted second degree murder." Pruitt also alleges the jury was "likely confused as to whether . . . counts" 2, 3, and 6 were to be considered in the context of reasonable foreseeability or aiding and abetting.

We are persuaded that Pruitt's reliance on *Overstreet* and *Engelhardt* is unavailing. Given the differences in the structure and limiting language of the instructions, trial evidence, and theories of the prosecution and the defense, we find no clear error.

Importantly, Instruction No. 9 properly informed the jury in the first paragraph that Pruitt was criminally responsible for aiding and abetting a crime if he had "the mental culpability" required to commit the crime. With regard to mental culpability, Instruction No. 11, the instruction setting forth the elements of the crime of attempted murder in the first degree, specified that the State must prove that Pruitt had the intent to commit murder in the first degree with premeditation. Similarly, with regard to Instruction No. 14, setting forth the elements of the lesser included offense of attempted murder in the second degree, the jury was properly instructed that the State must prove Pruitt had "the intent to commit Murder in the Second Degree." Thus, a fair reading of the first paragraph of Instruction No. 9 in conjunction with Instructions Nos. 11 and 14 properly informed the jury of the State's burden to prove that Pruitt, as an aider and abettor, had the requisite specific intent to murder Simonton.

Unlike the instructions used in *Overstreet* and *Engelhardt*, the phrase, "As to Counts 2, 3, and 6," followed the first paragraph (relating to all counts charged) and preceded the second paragraph of Instruction No. 9 regarding reasonable foreseeability. In this way, Instruction No. 9 delineated which counts the State was contending were reasonably foreseeable—Counts 2, 3, and 6. Under this plain reading, the jury should not have been confused or misled as to the requirement that Pruitt must have had the specific intent to murder Simonton if he was to be found guilty of Count 1 or the lesser offense.

In short, the specific language and structure of Instruction No. 9 informed the jury that *only* aggravated robbery, aggravated assault, and aggravated battery could be viewed as reasonably foreseeable crimes and that attempted first- or second-degree murder *could not* be regarded as reasonably foreseeable crimes. Especially when read in conjunction

12

with the attempted first- and second-degree murder instructions, we conclude it is highly unlikely that Instruction No. 9 confused the jury and mistakenly caused it to believe that Pruitt could be convicted of aiding and abetting murder without the requisite specific intent. See *State v. Hilt*, 299 Kan. 176, 184-85, 322 P.3d 367 (2014) (when reviewing jury instructions, Kansas courts review the instructions as a whole without focusing on any one instruction to determine whether they properly state the applicable law and whether it is reasonable to conclude they could have misled the jury).

While we conclude that Instruction No. 9 correctly informed the jury of both principles of criminal liability and the instructional language was not confusing or misleading, we will also conduct a clear error analysis since both Pruitt and the State have briefed this aspect of the issue. To find clear error, an appellate court must be firmly convinced the jury would have reached a different verdict absent the instructional error. *State v. Gleason*, 305 Kan. 794, 803, 388 P.3d 101 (2017). This inquiry requires the reviewing court to consider the complete record on appeal to determine the error's impact. *State v. Cheever*, 304 Kan. 866, 886-87, 375 P.3d 979 (2016).

As detailed earlier in the Factual and Procedural Background, the information filed in this case charged Pruitt as a principal—not as an aider and abettor—in three counts relevant to this appeal. In particular, Count 1 charged attempted murder in the first degree on the basis that Pruitt shot Simonton. Count 2 charged attempted aggravated robbery on the basis that Pruitt pointed a handgun at Simonton and Wolfe and demanded money. Count 6 charged aggravated battery on the basis that Pruitt caused great bodily harm to Simonton. In short, the State's theory of prosecution as reflected in the charging document was that Pruitt acted as a principal who personally committed three of the violent crimes charged.

At trial, the State's evidence also supported the theory that Pruitt was a principal in the commission of three of the violent crimes. There was direct and circumstantial

13

evidence that Pruitt fired one shot, point blank, from his semiautomatic handgun that struck Simonton in the left lower abdomen. This evidence supported the theory that Pruitt was a principal in the attempted murder and aggravated battery of Simonton. There was also direct and circumstantial evidence of Pruitt's involvement as a principal in the commission of the attempted robbery. Pruitt was involved in the planning of the robbery. He used his cellphone to arrange a meeting with Simonton to purportedly sell him marijuana. Pruitt, accompanied by Webster, displayed and used a deadly weapon in an effort to rob Simonton. In sum, there was substantial competent evidence to support the State's theory that Pruitt was a principal in the commission of these crimes.

The State's closing argument also closely tracked the State's theory and evidence tending to show that Pruitt was a principal actor, not just an aider and abettor. On appeal, Pruitt concedes: "It is likely the jury could have believed Mr. Pruitt was a principal actor for all the crimes, except for the aggravated assault charge, as the State argued in its closing arguments." We agree.

The count for which the reasonable foreseeability instruction was especially applicable was Count 3 relating to aggravated assault. As alleged by the State, that crime occurred when Webster personally pointed his revolver at Wolfe's head while he had him in a headlock. Clearly, Pruitt was not involved as a principal in this criminal conduct. While Instruction No. 9 did not explain this point, the State provided clarification during closing arguments when the prosecutor told the jury:

> "[A]ggravated assault for a gun to the head. And that's where the aid and abet comes in. The reasonably foreseeable. Isn't it reasonably foreseeable that Craig Wolfe would be another victim in that vehicle by Dreamis Webster by putting the gun there? . . . You got to ask yourself is that reasonably foreseeable. And I submit to you, ladies and gentlemen, the evidence says it is."

14

With this commentary, the prosecutor explained the meaning of the second paragraph of Instruction No. 9—that given Pruitt and Webster's joint criminal enterprise, it was reasonably foreseeable that Webster individually would use his handgun to commit aggravated assault on Wolfe. As a result, the State's closing argument clarified any confusion that the wording of Instruction No. 9 may have caused the jury. As argued by the prosecutor, the aiding and abetting and reasonable foreseeability paragraphs in Instruction No. 9 related specifically to Count 3, the aggravated assault of Wolfe.

Finally, it is noteworthy that Pruitt's defense was not that the State had failed to show it was reasonably foreseeable that he committed attempted murder or any of the other violent crimes. Indeed, defense counsel did not mention Instruction No. 9, the theories of aiding and abetting, or reasonable foreseeability during his closing argument. Instead, defense counsel argued that Wolfe was armed with a handgun and he and Simonton attempted to rob Pruitt and Webster during a failed drug transaction.

At the conclusion of his argument, defense counsel stated:

"[Simonton and Wolfe] tried to rob these guys that came in to say they were trying to buy marijuana off and it went bad. And they're the ones that got the losing end. [Wolfe] is chasing this first male, and guess what, he fires a shot. That's what that shell casing came from [*sic*]."

Pruitt's defense was a complete denial of any involvement, either as a principal or an aider and abettor, in the violent crimes. In short, Pruitt alleged he was a blameless victim, not a violent perpetrator. Given this defense generally denying any involvement with the crimes, Pruitt's objection to the wording of the second paragraph of Instruction No. 9 relating to the reasonable foreseeability of the commission of other crimes loses significance.

15

In summary, upon our review of the entire record, we are not firmly convinced the jury would have reached a different verdict absent any claimed instructional error. See *Gleason*, 305 Kan. at 803. And, assuming without deciding that Instruction No. 9 was improperly worded, we find no clear error.

EVIDENTIARY OBJECTION

Pruitt next contends the district court erred when it admitted testimony "that either Mr. Pruitt or his cousin, Mr. Webster, had shouted the gang reference, 'Blood,' to come get him or pick him up as he fled the scene of the crime." Pruitt challenges both the relevance and probative value of this evidence while also claiming it was "extremely prejudicial, without any probative value." The State counters that this issue was not preserved for appellate review. Alternatively, as to the merits, the State claims the statement was admissible because it was spoken as Pruitt and Webster were leaving the crime scene. Finally, if there was error, the State asserts it was harmless.

Before trial, Pruitt filed a motion in limine requesting that the "State be precluded from introducing any evidence or eliciting any testimony that relate[d] to gang involvement by [Pruitt]. [Because] [a]ny mention of this would be highly prejudicial to [Pruitt], and such prejudice would outweigh any probative value it may have." At the hearing on this motion, the State explained:

"[W]hile the suspects were running from the scene, our witness [Craig Wolfe] heard them say, Blood, pick me up. . . . [W]e don't intend to put on evidence that they are documented Blood gang members, but that [those were] the words Craig Wolfe heard as the suspects were running from the scene."

Later, the prosecutor reiterated that "it's not the State's intent to make this a gang case or evidence of that, Judge." The district court granted Pruitt's motion in limine "with

16

the exception of the reference to Blood yelled by . . . one of the defendants during the incident."

At trial, two witnesses gave their renditions of the "Blood, pick me up" statement mentioned by Wolfe during police interviews. Officer Melissa Burns testified that Wolfe told her that he heard "one male . . . yell to the other . . . come get me, Blood." Defense counsel objected, and the district court overruled the objection but allowed a continuing objection. Detective Steven Molde of the Wichita Police Department also interviewed Wolfe following the shooting. At trial, Detective Molde testified Wolfe heard Pruitt yell, "Blood, pick me up," after Webster shot Simonton. Defense counsel did not object to this statement. Finally, Wolfe testified at trial, over defense objection, that he heard Webster or Pruitt yell, "Wait for me." Of note, Wolfe did not mention the word, "Blood."

When reviewing the admissibility of evidence, appellate courts follow a two-step analysis. First, our court must determine whether the evidence is relevant. Usually, all evidence—including gang affiliation evidence—is admissible if relevant. *State v. Peppers*, 294 Kan. 377, 386, 276 P.3d 148 (2012); K.S.A. 60-407(f). Relevant evidence is defined as evidence that has "'any tendency in reason to prove any material fact.'" *State v. Page*, 303 Kan. 548, 550, 363 P.3d 391 (2015) (quoting K.S.A. 60-401[b]). This definition encompasses two elements:  materiality and probativity. Evidence is material when the fact it supports is disputed and is significant under the substantive law of the case. *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016). This court reviews the materiality of evidence de novo. *Page*, 303 Kan. at 550. Evidence is probative if it "furnishes, establishes, or contributes toward proof." *McCormick*, 305 Kan. at 47. This court reviews probativity for abuse of discretion. 305 Kan. at 47.

Even if evidence is relevant, a district court may exclude it if the district court determines the probative value of the evidence is outweighed by its potential for

producing undue prejudice. K.S.A. 60-445. We review this aspect of the test for abuse of discretion. *State v. Lowrance*, 298 Kan. 274, 291, 312 P.3d 328 (2013).

The State initially responds that Pruitt failed to preserve this issue for appeal because Pruitt's objections at the pretrial hearing and trial were not sufficiently specific. Generally, a party must lodge a timely and specific objection to the admission or exclusion of particular evidence in order to preserve the evidentiary question for appellate review. *State v. King*, 288 Kan. 333, 348-49, 204 P.3d 585 (2009); Kansas law further requires that such an objection be specific and contemporaneous. K.S.A. 60-404.

We have reviewed the record and are persuaded that Pruitt sufficiently informed the district court prior to and during trial that he objected to any mention of the "Blood" statement because he claimed it was an inadmissible gang reference.

As to the merits, Pruitt first claims the statement in question was "not material to any ultimate fact in issue," because it did not "affect witness credibility or bias, nor [did] it affect motive, intent, or any other material fact." Instead, Pruitt asserts the statement added nothing to the State's case other than to show that he was "involved in gang activity."

Recently, our Supreme Court addressed the admissibility of gang evidence in *Peppers*, 294 Kan. 377. In particular, the court found that "[f]or evidence of gang affiliation to be admissible there must be sufficient proof that gang membership or activity is related to the crime charged." 294 Kan. 377, Syl. ¶ 2. Moreover, our Supreme Court indicated that generally res gestae evidence related to gangs is admissible "even if it concerns the events surrounding commission of a crime." 294 Kan. 377, Syl. ¶ 4. See *State v. Goodson*, 281 Kan. 913, 922, 135 P.3d 1116 (2006); *State v. Tran*, 252 Kan. 494, 504, 847 P.2d 680 (1993).

18

The State persuasively reasons the "statement made by one of the suspects to the other as they were running away was relevant to show that they were working in concert and leaving the scene of the crime together." Given that the State presented evidence that Pruitt was acting either as a principal or aider and abettor, this brief remark made by either Pruitt or Webster was relevant to show that Webster and Pruitt were working in concert during the commission of the charged crimes and their escape from the crime scene.

Moreover, we fail to discern any prejudice. There was no evidence that the "Blood" reference related to any gang association or that Pruitt or Webster were members of any gang. Assuming the jury made such an association, the impact of this evidence would have been mitigated because Wolfe never personally testified at trial to any "Blood" reference when recounting the statement made about the events of March 6, 2015. We conclude the challenged statement was admissible and not overly prejudicial. See K.S.A. 60-445.

Finally, assuming the admission of the "Blood" reference was error, we conclude it was harmless. As detailed in the Factual and Procedural Background, there was considerable direct and circumstantial evidence of Pruitt's involvement in the commission of these crimes. The significance of the challenged evidence pales in comparison to the substantial incriminating evidence of Pruitt's guilt. In this regard, the State has shown beyond a reasonable doubt that any error did not affect the outcome of the trial in light of the entire record. See *State v. Santos-Vega*, 299 Kan. 11, 24, 321 P.3d 1 (2014).

MODIFICATION OF JAIL TIME CREDIT

Next, Pruitt contends the district court's journal entry of judgment indicating that he had earned no jail time credit was erroneous because the court lacked jurisdiction to modify the 312 days of jail time credit previously awarded him at sentencing. Pruitt also

19

complains that the restitution award in the district court's journal entry of judgment is inconsistent with the court's oral restitution ruling made at the time of sentencing. As a result, with regard to both complaints, Pruitt asks our court to "remand to the district court for correction of the journal entry 'reflecting the oral sentence of the court.'" We will separately consider these two matters.

Pruitt's presentence investigation (PSI) report revealed that he was on probation for a juvenile adjudication of aggravated battery when Simonton was shot. Pruitt was taken into custody on April 30, 2015, and remained in jail until the sentencing date for this case on June 24, 2016—a total of 422 days. At the sentencing hearing, the State discussed the effects of Pruitt's juvenile sentence on his criminal sentence:

"[T]he Court should know, that even though [Pruitt] has a three-year [juvenile] sentence . . . the case law says that we cannot run this consecutive to a juvenile case. And then, quite frankly, once you impose [a] sentence here, [the State has] an obligation to terminate that [juvenile] sentence. And so, basically, he is getting a three-year pass on a juvenile shooting, because he is going to get all that credit in this particular case because we can't run them consecutive."

The district judge pronounced Pruitt's sentence and further ruled: "I will run those counts consecutive to each other and consecutive pursuant to operation of law to any other outstanding case or cases . . . allowed by our current law." The district judge then proceeded to the matter of jail time credit:

"[THE COURT]: You will receive credit for jail time that you have been in jail on this case for up to this point in time.
"Do you have a computation of that, Mr. Muth [the prosecutor]?
"MR. MUTH: I do, Judge. As I indicated, he was being held on his juvenile case as well. But since it by operation of law will run concurrent to that, he has 312 days of credit.

20

"THE COURT:  You will receive 312 days of jail credit, up until today's date. From today forward, you will technically be in the custody of the Secretary of Corrections. You will be eligible for up to a 15 percent reduction of your sentence for good time."

Following the sentencing hearing, the State filed the journal entry of judgment. In the "Incarceration Credit" portion of the journal entry, the State noted that Pruitt had spent 422 days in custody prior to sentencing, but it listed the amount of jail time credit as zero. The journal entry explained:  "For dates above not awarded, defendant was being held on [this case] and serving a sentence [for the juvenile case]. As this case is consecutive to any other cases which the law permits, then defendant is not eligible for duplicate credit for these dates."

Upon the filing of the journal entry, Pruitt filed a motion for jail time credit with the district court in which he argued that "it was [his] understanding that because he would ultimately be discharged on the juvenile case, he would be given credit for all the time he had served until that time on this case." The district court held a hearing on the matter. The district judge denied Pruitt's motion, reasoning:  "It sounds to me like this is a request for duplicative credit under these . . . circumstances, and I don't think he is entitled to it."

On appeal, the parties offer divergent views on the exact nature of the issue before our court on appeal. Pruitt contends the district court lacked jurisdiction to adjust his jail time credit after the sentencing hearing. Pruitt does not address whether, assuming there was jurisdiction, the district court's ruling was correct. The State, on the other hand, does not dwell on the jurisdictional issue, but it assures us that Pruitt was legally not entitled to any jail time credit. Since this is Pruitt's appeal, we will only address the jurisdictional issue that he has raised.

21

Whether the district court could legally order a postsentence modification of Pruitt's jail time credit is a question of law over which this court exercises unlimited review. See *Fuller v. State*, 303 Kan. 478, 492, 363 P.3d 373 (2015).

Under Kansas law, jail time credit must be determined by the district court and stated in the journal entry at the time of sentencing. *State v. Theis*, 262 Kan. 4, 7, 936 P.2d 710 (1997); *State v. Edwards*, No. 109,685, 2014 WL 1612500, at *3 (Kan. App. 2014) (unpublished opinion). Generally, a defendant confined pending his or her conviction and sentencing may receive credit for time served in confinement. K.S.A. 2017 Supp. 21-6615(a). But Kansas courts have held that jail time credit is earned only for the time spent in jail solely on account of the offenses for which the defendant is being sentenced. See *State v. Lofton*, 272 Kan. 216, 217-18, 32 P.3d 711 (2001). In other words, a defendant may not receive duplicate jail time credit. *State v. Evans*, No. 105,185, 2011 WL 3444348, at *2-3 (Kan. App. 2011) (unpublished opinion).

The crux of Pruitt's argument is that the district court's award of 312 days of jail time credit was a part of his sentence imposed at the time of the sentencing hearing, and "[b]ecause the sentencing pronouncement controls, Mr. Pruitt argues that any subsequent decision of the district court changing that decision was ineffective for lack of jurisdiction."

We agree with Pruitt that "[o]nce a legal sentence has been pronounced from the bench, the sentencing court loses subject matter jurisdiction to modify that sentence except to correct arithmetic or clerical errors." *State v. Hall*, 298 Kan. 978, 983, 319 P.3d 506 (2014). We disagree, however, that the district court's postsentencing modification of jail time credit is a modification of Pruitt's sentence for which the district court had no jurisdiction.

Our court has previously rejected Pruitt's argument. In *State v. Smith*, 33 Kan. App. 2d 554, 555, 105 P.3d 738 (2005), the district court made an oral ruling at sentencing that Smith was entitled to 92 days of jail time credit. After the State commented that this award would give Smith double credit, the district court modified its ruling and gave Smith only 28 days of jail credit. Smith objected and, on appeal, argued "the trial court was without jurisdiction to modify his sentence by subtracting jail-time credit the court had imposed a lawful sentence." 33 Kan. App. 2d at 555.

Our court rejected Smith's argument and found that the district court could modify the jail time credit award at any time because "the original sentence did not change." 33 Kan. App. 2d at 557. Other panels of this court have adopted this same logic and holding. See *Evans*, 2011 WL 3444348, at *3 ("[T]he action taken by the [district] court after sentencing was permissible because Evans' sentence remained at 16 months despite the court's [modification of Evans' jail-time credit]."). See also *State v. Cockerham*, 266 Kan. 981, 985, 975 P.2d 1204 (1999) (granting a defendant more jail time credit does not modify sentence).

Applying this precedent, we are persuaded that the district court had jurisdiction to modify Pruitt's jail time credit after sentencing. Although the district court orally pronounced that Pruitt was entitled to 312 days of jail time credit at sentencing, afterward it determined it had erred and modified the award to zero days. Since a modification of jail time credit is not an impermissible modification of a sentence, the district court had subject matter jurisdiction to modify its prior jail time credit ruling. We find no error.

Pruitt also complains that, although the district court found that he should not pay restitution, the journal entry of judgment reflected a restitution order of $8,822.81. The State acknowledges the original journal entry was incorrect, but it notes that an amended journal entry was filed on June 26, 2017, that corrected this mistake. We conclude this particular issue is moot. See *State v. Williams*, 298 Kan. 1075, 1082, 319 P.3d 528 (2014)

(an issue is moot if "'it is clearly and convincingly shown the actual controversy has ended, the only judgment that could be entered would be ineffectual for any purpose, and it would not impact any of the parties' rights.' [Citations omitted.]").

## USE OF CRIMINAL HISTORY TO ENHANCE SENTENCE

Finally, Pruitt contends the district court violated his due process rights as articulated in *Apprendi*, 530 U.S. at 477, 490, when it enhanced his sentence based upon his criminal history without first requiring the State to include his prior convictions in its complaint and to prove those convictions to a jury beyond a reasonable doubt. The Kansas Supreme Court rejected a similar argument in *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002). Since then, it has reaffirmed *Ivory* on multiple occasions. See *State v. Williams*, 299 Kan. 911, 941, 329 P.3d 400 (2014); *State v. Baker*, 297 Kan. 482, 485, 301 P.3d 706 (2013).

This court is required to follow Supreme Court precedent absent some indication that the court is departing from its earlier position. *State v. Belone*, 51 Kan. App. 2d 179, 211, 343 P.3d 128, *rev. denied* 302 Kan. 1012 (2015). We know of no indication that our Supreme Court is departing from its holding in *Ivory*. Accordingly, we conclude that the district court did not violate Pruitt's constitutional due process rights when it considered his criminal history as part of its sentencing determination.

Affirmed.